UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| ROGER MILLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 3:13-CV-306-TAV-HBG |
| ) | |
| MARYVILLE COLLEGE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This civil action is before the Court on plaintiff Roger Miller's motion for partial summary judgment [Doc. 14] and defendant Maryville College's motion for summary judgment [Doc. 17] and motion to strike portions of declarations filed by plaintiff [Doc. 25]. The parties have responded and replied to each of the three motions. Having reviewed the parties' arguments, the record in this case, and relevant law, the Court will deny plaintiff's motion for partial summary judgment, grant defendant's motion for summary judgment, and deny as moot defendant's motion to strike.

I. **BACKGROUND**

Plaintiff alleges age discrimination under the Age Discrimination in Employment Act and the Tennessee Human Rights Act as well as breach of contract under Tennessee law [Doc. 1 ¶¶ 13–14, 16]. Specifically, plaintiff contends that Maryville College eliminated his tenured position as the Associate Professor of Physics based on his age and in violation of the applicable provision of the college's Faculty Handbook [*Id.* ¶¶ 4–16].

Maryville College is a private liberal arts college in Maryville, Tennessee [Doc. 17-1 ¶ 2]. Its faculty and programs of study are organized into Academic Divisions, such as the Division of Education, the Division of Fine Arts, and the Division of Natural Sciences [Doc. 24-1 ¶ 2]. Each Academic Division comprises two or more related disciplines [*Id.*]. The Division of Natural Sciences, for example, comprises several disciplines, including chemistry, biology, and physics [*Id.*].

In 1992, plaintiff was searching for a tenure-track position and reviewed and responded to an advertisement listed by Maryville College [Doc. 21-1 ¶ 3]. The advertisement, titled "Faculty Position in Physics," sought "a broadly trained physical scientist possessing a strong background in physics" [*Id.*]. It noted that a Ph.D. in physics or a closely-related discipline was required and that the successful applicant "will supervise senior thesis research as well as teach introductory physics for science majors and general education courses for non-science majors" [*Id.*].

Plaintiff applied, and the Chairman of the Division of Natural Sciences responded by letter, stating he was delighted by plaintiff's interest "in the sciences at Maryville College," informing him "the selection process for the position in physics has progressed significantly," and enclosing "an overview of academic programs" and "the goals and objectives of the Department of Physics and the Major in Physics for Teacher Licensure" [Doc. 21-1 p. 2, 7]. One page of the overview of academic programs was titled "Natural Sciences" and listed various subjects, including physics [*Id.* at 9].

2

Maryville College ultimately hired plaintiff as an Assistant Professor of Physics in 1993 [Doc. 17-2 p. 3]. While plaintiff's initial Appointment to Faculty form states he was appointed as Assistant Professor in the Division of Natural Sciences [Doc. 21-1 p. 10], the Reappointment to Faculty forms state he was reappointed as Assistant Professor of Physics [Doc. 24-1 p. 14–18]. When he was awarded tenure in 1999, plaintiff's title changed to Associate Professor of Physics [Doc. 17-2 p. 3]. Plaintiff held this title until May 31, 2012, when his employment with the college ended [*Id.* at 2–3].

From 1993 to 2012, plaintiff was Maryville College's only physics professor [*Id.* at 3]. Plaintiff taught Physics 101 sixteen times, Physics 102 sixteen times, Physics 201 eighteen times, Physics 202 eighteen times, and other Advanced Physics courses, including Physics 271 and 301, twenty-five times [Doc. 15 p. 3]. Plaintiff also taught core science courses—Science 150 nine times and Science 250 six times—as well as core curriculum courses—Orientation 110 one time and FRS 130 five times [*Id.* at 4]. When asked in his deposition whether almost all of the courses he taught were physics classes or courses, plaintiff stated, "The vast majority. I did teach some that were in the core" [Doc. 17-2 p. 3].[1]

During the 2011—2012 academic year, Maryville College faced budgetary challenges based, in part, on a lower-than-anticipated enrollment [Doc. 17-1 ¶ 5]. In an attempt to balance the budget and meet enrollment goals, Maryville College's President

---

[1] When asked to clarify the term "core," plaintiff responded, "Core curriculum. Astronomy, I taught . . . . [T]hat was in the core, but it's also a physics course, so I'm not sure how you'd like to qualify that" [Doc. 17-2 p. 3].

directed Dr. Barbara Wells, the Vice President and Dean of the College, to develop a plan to change the College's academic programs [*Id.* ¶ 6]. After reviewing the situation, it was clear to Dr. Wells that the College needed to eliminate certain academic programs and faculty positions [*Id.* ¶ 7]. According to Dr. Wells, in deciding which programs to eliminate, she considered several factors, including, but not limited to: how essential the program was to a liberal arts education; the number of students involved in the program; the cost to deliver the program; and the program's marketability, i.e., how the elimination of the program may impact enrollment [*Id.*¶ 8]. She obtained information regarding the number of students majoring and minoring in the programs being considered for elimination and met with each of the Division Chairs to discuss the impact of possible cuts [*Id.* ¶ 9].

In addition, Maryville College is accredited by the Southern Association of Colleges and Schools Commission on Colleges [*Id.* ¶ 11]. One of the Association's requirements for maintaining a major is that at least twenty-five percent of the major's course hours be taught by faculty members holding an appropriate terminal degree, which is usually a doctorate degree or its equivalent [*Id.* ¶ 13]. Dr. Wells noted that, by eliminating a major, the College could reduce costs by having an adjunct professor or instructor with a master's degree teach those courses [*Id.* ¶ 14].

Ultimately, Dr. Wells proposed the College eliminate the Physics Program, which consisted of the Chemical Physics Major and the Physics Minor, and the French Program, which consisted of the French Minor [*Id.* ¶ 10]. Eliminating these programs would result

4

in the elimination of two tenured faculty teaching positions, the Associate Professor of Physics position held by plaintiff, and the Associate Professor of French position held by Dr. Elisabeth Lanois [*Id.*]. The proposal was approved by the President and subsequently presented to and approved by the Board of Directors at its April 2012 meeting [*Id.*]. A memorandum from the President, dated May 1, 2012, informed faculty and staff that "four positions (three faculty and one staff) are being eliminated as a result of program eliminations and restructuring in the academic division" [Doc. 24-1 p. 12]. The memorandum specified that "[t]he programs eliminated include the major in chemical physics and the minors in physics and French" [*Id.*]. A memorandum from Dr. Wells, on the other hand, was circulated to students, informing them that the Board had approved the addition of seven new majors and two new minors [*Id.* at 3–4]. The memorandum listed them, stating "[t]he new academic programs are the following," and closed with "[w]e are delighted to offer these programs" [*Id.*].

To terminate the tenured professors, Maryville College relied on the Faculty Handbook provision titled "Separation Due to Institutional Circumstances" [*Id.* ¶ 15–16; *see also* Doc. 16-2]. The provision, which is the centerpiece of this litigation, states: "[s]eparation of a faculty member, whether on tenure or term contract, is also possible as a result of significant reduction or discontinuation of the academic program in which the faculty member does most of his or her teaching" [Doc. 16-1 p. 41]. On April 30, 2012, Dr. Wells met with plaintiff and notified him that his position would be eliminated pursuant to this provision of the Faculty Handbook [Doc. 17-1 ¶ 16; Doc. 17-2 p. 3–4,

5

14]. She handed plaintiff a letter from the President quoting from this provision and noting plaintiff was eligible for one more year of employment at the College [Doc. 17-2 p. 3–4, 14–15]. This terminal year teaching opportunity eventually was denied by plaintiff, and his employment ended on May 31, 2012 [Doc. 17-1 ¶ 16; Doc. 17-2 p. 5–7, 14–17; Doc. 16-2]. Plaintiff's separation notice stated, as the circumstances of separation, "Restructuring of academic program resulted in program reduction and elimination of position" [Doc. 16-2].

Since plaintiff's termination, the Maryville College course catalog's description under "Physics" changed. The 2011—12 course catalog, under "Physics," used the terms "the curriculum in chemical physics," "the program," "the major," and "the minor," and listed the courses that compose the major and minor [Doc. 17-1 p. 26–28]. That year, Maryville College offered twelve physics courses: two college physics, two general physics, and two modern physics, as well as analytical mechanics, topics in physics, electricity and magnetism, internship in chemical physics, practicum in chemical physics, and senior research project [*Id.* at 29–31]. The later course catalogs, however, under "Physics," used the terms "courses in physics" and "the courses" [*Id.* at 17–18, 22–23]. In the 2013–14 school year, only six physics courses were offered: two college physics, two general physics, modern physics, and topics in physics [*Id.* at 24–25].

6

## II. STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002). Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the

7

evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III. ANALYSIS

### A. Age Discrimination

In its motion for summary judgment, defendant asserts that plaintiff's age discrimination claims are time-barred under both federal and state law [Doc. 18 p. 8–11]. Defendant argues plaintiff did not file his Equal Employment Opportunity Commission ("EEOC") charge or state-court complaint within the applicable limitations periods [*See id.*]. Plaintiff did not respond to these arguments in his response brief or elsewhere [*See generally* Doc. 21].

In the Sixth Circuit, "'jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.'" *Briggs v. Univ. of Detroit-Mercy*, No. 14-1725, 2015 WL 2191127, at *5 (6th Cir. May 12, 2015) (quoting *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013)). "That said, a district court may not use a party's failure to respond (in whole or in part) as a reason for granting summary judgment 'without first

8

examining all the materials properly before it under Rule 56(c).'" *Id.* (quoting *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014)). This is because a party is never required to respond to a motion for summary judgment to prevail as the burden of establishing the nonexistence of a material factual dispute always rests with the movant. *Id.* (citation omitted). The Court, therefore, must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists but will not sua sponte comb the record from the partisan perspective of an advocate for the non-moving party. *Id.* (citations omitted).[2]

A claim under the Age Discrimination in Employment Act ("ADEA") is barred if a discrimination charge is not filed with the EEOC within 300 days of the alleged discriminatory act. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001); *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 375–76 (6th Cir. 2002) ("In Tennessee, which has state laws prohibiting age discrimination, a plaintiff's ADEA claim will be dismissed as untimely if the plaintiff fails to file a charge within 300 days of the discriminatory action."). "[T]he starting date for the 300-day limitations period is when the plaintiff learns of the employment decision itself, not when the plaintiff learns that the employment decision may have been discriminatorily motivated." *Amini*, 259 F.3d at 498–99. The Tennessee Human Rights Act has a different limitations period. It requires the action be filed in chancery court or circuit court within one year after the alleged

---

[2] The Court notes that some courts within the Sixth Circuit have granted summary judgment with respect to certain claims based solely on abandonment. *See, e.g.*, *Brown*, 545 F. App'x at 372 (collecting cases).

9

discriminatory act ceases. Tenn. Code. Ann. § 4-21-311(d). A discriminatory termination ceases "when the plaintiff is given unequivocal notice of the employer's termination decision, even if employment does not cease until a designated date in the future." *Weber v. Moses*, 938 S.W.2d 387, 391–92 (Tenn. 1996).

On April 30, 2012, plaintiff was given unequivocal notice of Maryville College's decision to terminate him. On that day, Dr. Wells met with plaintiff, notified him that his position would be eliminated, and provided him with a letter from the President to that effect [Doc. 17-1 ¶ 16; Doc. 17-2 p. 3–4, 14–15 ("I regret to inform you of the decision to terminate your position at Maryville college.")]. Under both the federal and state statutes, the limitations periods began to run on this date. Plaintiff, however, did not file his EEOC charge until March 25, 2013, about 329 days later [Doc. 1-4]; has not, to the Court's knowledge, instituted an action in chancery or circuit court; and did not file his complaint in this action until May 31, 2013, about one year and one month later [Doc. 1]. Accordingly, having reviewed all the briefing and the record, the Court finds the EEOC charge and the complaint were not filed within the applicable limitations periods. Plaintiff has abandoned his age discrimination claims, and defendant's motion for summary judgment will be granted with respect to those claims.

### B. Breach of Contract

To establish a breach of contract under Tennessee law, plaintiff must show the existence of an enforceable contract, a breach of that contract, and damages as a result of that breach. *Figal v. Vanderbilt Univ.*, No. M2012-02516-COA-R3-CV, 2013 WL

10

5459021, *7 (Tenn. Ct. App. Sept. 27, 2013). The parties agree, for purposes of summary judgment, that the Faculty Handbook language relating to separation due to institutional circumstances constitutes an enforceable contract [Doc. 18 p. 16 n.2].

The interpretation of a written contract is a question of law. *BSG, LLC v. Check Velocity, Inc.*, 395 S.W.3d 90, 92 (Tenn. 2012). A cardinal rule of contract interpretation is to ascertain and give effect to the parties' intent. *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). Courts determine the parties' intent by examining the plain and ordinary meaning of the written words. *Id.* The focus is on the four corners of the entire contract, the circumstances in which the contract was made, and the parties' actions in fulfilling their contractual obligations. *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 465 (Tenn. 2012)). If the contract language is found to be clear and unambiguous, the contract language is interpreted according to its plain terms and ordinary meaning. *BSG*, 395 S.W.3d at 93.

If, however, the Court finds the terms are ambiguous—that is, they are susceptible to more than one reasonable interpretation—the Court will employ other rules of contract construction to determine the parties' intent. *Dick Broad.*, 395 S.W.3d at 659. One of these principles is that ambiguous contract provisions will be construed against the drafter of the contract. *West*, 2014 WL 7242746, at *6. Contract language will not be considered ambiguous, however, merely because the parties differ as to their interpretation of the language. *BSG*, 395 S.W.3d at 93. A contract is ambiguous only

when it is of uncertain meaning and may fairly be understood in more ways than one. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). The Court will not use a strained construction of the language to find an ambiguity where none exists. *Id.*

The parties agree the disposition of the breach of contract claim turns on the meaning and application of the Faculty Handbook provision titled "Separation Due to Institutional Circumstances," which Maryville College relied on to terminate plaintiff.[3] The provision states: "[s]eparation of a faculty member, whether on tenure or term contract, is . . . possible as a result of significant reduction or discontinuation of the academic program in which the faculty member does most of his or her teaching" [Doc. 16-1 p. 41].

First, plaintiff contends that, because the courses he taught continue to be offered by the college, the academic programs in which he did most of his teaching were neither significantly reduced nor discontinued [Doc. 15 p. 1, 5; Doc. 21 p. 1–2]. In other words, plaintiff argues the vast majority of his "teaching load" was not within the physics major and minor—which were discontinued—but "within the Natural and Mathematical

---

[3] The parties' briefing makes their agreement clear [*See* Doc. 21 p. 1 (plaintiff's response brief) ("With respect to Plaintiff's breach of contract claim, the crux of this case is the definition of 'academic program.'"); Doc. 22 p. 10 (defendant's response brief) ("The sole issue in regards to Plaintiff's breach of contract claim is the proper meaning of the term 'academic program' for purposes of the Faculty Handbook."); Doc. 23 p. 2 (plaintiff's reply brief) ("[T]he issue that remains is whether the academic program in which [plaintiff] did most of his teaching was significantly reduced or discontinued."); Doc. 23 p. 3 (plaintiff's reply brief) ("Plaintiff agrees that the issue in this case is based on the definition of the term 'academic program' in addition to the interpretation of the provision allowing for the separation of a tenured faculty member. . . . This case turns upon whether the Defendant's treatment of one of its tenured professors was authorized by [that provision] . . . .")].

12

Science Programs and the Core Curriculum" [Doc. 15 p. 4–5]. Assuming "academic program" is equivalent to a course of study, plaintiff asserts he taught in the following academic programs: Biology, Biochemistry, Chemical Physics, Chemistry, Chemistry for Teacher Licensure, Engineering, Mathematics, Mathematics for Teacher Licensure, and Physics [*Id.* at 6].

Second, plaintiff argues the term "academic program," which is not defined in the Faculty Handbook, presents an ambiguity that must be construed against the drafter and defendant, Maryville College [Doc. 21 p. 1].

In support of his first argument, plaintiff claims the vast majority of physics courses he taught are "service courses" for other majors [*See, e.g.*, Doc. 15 p. 3]. According to plaintiff, service courses are courses in one discipline that are required courses for majors in other disciplines [Doc. 21 p. 6]. He claims, of the 114 courses he taught, only four courses (or 3.5%) would not have been offered had the Chemical Physics Major and Physics Minor never been offered [*Id.*]. Plaintiff acknowledges that, had the courses he taught only supported the physics major and minor, "Maryville College would have likely been within its rights to terminate" [Doc. 15 p. 7].

The rest of the courses (or 96.5%) allegedly continue to be either required or optional courses to support other programs [*Id.* at 7]. As plaintiff argues, the elimination of the physics major and minor "had minimal bearing on the majority of the classes he was teaching, because they continue to be required courses for majors and minors other than Physics" [Doc. 21 p. 6]. Plaintiff also notes that, over the course of his career at

13

Maryville, he taught only twenty physics minors and two chemical physics majors, but taught over 500 students in the mathematics and science programs and over 400 students in the general education program [*Id.* at 7].

As for ambiguity, plaintiff contends there is no consensus definition of "academic program" and that the handbook language "is specifically directed to the areas where the faculty member does most of his or her teaching, most likely to provide for situations in which the courses taught by the faculty member no longer exist or are no longer in demand" [Doc. 21 p. 8, 10]. Plaintiff also notes that "curriculum" is the fourth-listed definition for "program" in the Merriam-Webster dictionary [*Id.* at 10]. Merriam-Webster in turn defines curriculum as "the courses offered by an educational institution" or "a set of courses constituting an area of specialization" [*Id.* at 10–11].[4]

As an initial matter, the Court rejects plaintiff's contention that, by electing not to define "academic program," defendant has necessarily rendered the term ambiguous

---

[4] Plaintiff also discusses *Garmon v. Fisk Univ.*, No. 01A01-9803-CH-00132, 1999 WL 118215 (Tenn. Ct. App. Mar. 9, 1999), which the Court finds distinguishable. Based on *Garmon*, plaintiff argues "Maryville College has the burden to show by competent proof how the academic programs in which Plaintiff did most of his teaching were significantly reduced or discontinued" [Doc. 15 p. 9; Doc. 21 p. 13]. As an initial matter, *Garmon* was decided after a trial on the merits, and does not alter the burden of proof at summary judgment. Second, the parties agree this case turns on the Court's interpretation of the handbook provision, which the Court notes is more specific than the vague provision in *Garmon*. The specificity of the Maryville College provision and the undisputed elimination of the physics major and minor diminish any claim that defendant acted arbitrarily. Third, unlike *Garmon*, the institutional circumstances that led to the elimination of plaintiff's position are not at issue in this case [*Compare* Doc. 17-2 p. 4 (plaintiff's deposition) (acknowledging "Maryville College had been experiencing serious financial difficulties for several years preceding [his termination]"), *with Garmon*, 1999 WL 118215, at *4 (finding no significant changes in institutional need since Dr. Garmon was hired and no indication that university was in financial crisis)]. In sum, *Garmon* does not disturb the Court's analysis of plaintiff's breach of contract claim.

14

[Doc. 21 p. 11]. Having reviewed the Faculty Handbook and the parties' arguments, the Court finds the term "academic program," as used in the handbook, refers to a program of instruction in which a student can receive a major, minor, or other similar degree or certification [*See* Doc. 16-1 p. 41 (stating that separation is possible "as a result of significant reduction or discontinuation of the academic program in which the faculty member does most of his or her teaching")]. Accordingly, the Court finds physics is an academic discipline; the Division of Natural Sciences, of which physics is a part, is an academic division; and the existence of the physics major and minor rendered physics one of Maryville College's academic programs [*See id.*; *id.* at 18 (stating, under handbook section titled Academic Division Organization, "[t]he academic disciplines are organized into units designated as academic divisions")].

In his deposition, plaintiff admitted he was hired as Assistant Professor of Physics and became Associate Professor of Physics upon earning tenure [Doc. 17-2 p. 3]. Since he was hired, plaintiff was Maryville College's only physics professor, and as he admits, the vast majority of courses he taught were physics courses. Of the 114 courses plaintiff taught, at least 93, or 81.5%, were physics courses. And all physics courses except Physics 101 and 102—that is, 61 of the 114, or 53.5%—fulfilled requirements of the physics major and minor. In sum, although many of the courses plaintiff taught supported other academic programs and continue to be offered by Maryville College, the Court finds plaintiff did most of his teaching in the physics academic program and that,

15

given the elimination of the physics major and minor, it cannot be said that the physics academic program did not experience a "significant reduction or discontinuation."[5]

In interpreting the handbook language, the Court finds significant the type of courses plaintiff taught and the existence of the physics major and minor, not whether the physics courses he taught fulfilled other programs' requirements or were taken by students not majoring or minoring in physics. The Court agrees with defendant's articulation that "[t]he fact that some or even most of the Physics courses taught by Plaintiff were required for other majors does not change the fact that they were part of the Physics Program" [Doc. 24 p. 9; *see also id.* ("While some of these courses also met requirements for other majors or minors, they were still part of the Physics Program because they were required for the [physics major and minor].")]. Accordingly, the Court is not persuaded by plaintiff's argument that determining the academic program in which he did most of his teaching should be assessed by comparing the number of courses he taught that also supported other majors and minors with the small number of courses he taught that "served only to support the Chemical Physics major or Physics minor" [*See* Doc. 23 p. 8 (plaintiff's reply brief) ("Because the classes that served only to support the Chemical Physics major or Physics minor were so few, it cannot be said, under any interpretation of the elusive term 'academic program,' that the academic program in which [plaintiff] did most of his teaching was significantly reduced or discontinued.")]. The Court notes the "Faculty Position in Physics," as plaintiff states, was always

---

[5] By the 2013-14 academic year, the only physics courses offered by Maryville College were the physics courses that are required for students in other majors [Doc. 17-1 ¶ 25].

given the elimination of the physics major and minor, it cannot be said that the physics academic program did not experience a "significant reduction or discontinuation."[5]

In interpreting the handbook language, the Court finds significant the type of courses plaintiff taught and the existence of the physics major and minor, not whether the physics courses he taught fulfilled other programs' requirements or were taken by students not majoring or minoring in physics. The Court agrees with defendant's articulation that "[t]he fact that some or even most of the Physics courses taught by Plaintiff were required for other majors does not change the fact that they were part of the Physics Program" [Doc. 24 p. 9; *see also id.* ("While some of these courses also met requirements for other majors or minors, they were still part of the Physics Program because they were required for the [physics major and minor].")]. Accordingly, the Court is not persuaded by plaintiff's argument that determining the academic program in which he did most of his teaching should be assessed by comparing the number of courses he taught that also supported other majors and minors with the small number of courses he taught that "served only to support the Chemical Physics major or Physics minor" [*See* Doc. 23 p. 8 (plaintiff's reply brief) ("Because the classes that served only to support the Chemical Physics major or Physics minor were so few, it cannot be said, under any interpretation of the elusive term 'academic program,' that the academic program in which [plaintiff] did most of his teaching was significantly reduced or discontinued.")]. The Court notes the "Faculty Position in Physics," as plaintiff states, was always

---

[5] By the 2013-14 academic year, the only physics courses offered by Maryville College were the physics courses that are required for students in other majors [Doc. 17-1 ¶ 25].

contemplated to support other science and non-science majors [Doc. 23 p. 4; *see also* Doc. 21-1 ¶ 3 (advertisement for position) (noting the successful applicant "will supervise senior thesis research as well as teach introductory physics for science majors and general education courses for non-science majors")].

The Court also rejects, as contrary to the handbook's plain language, arguments that attempt to substitute "teaching load" or "the courses the faculty member taught" for the phrase "the academic program in which the faculty member does most of his or her teaching" [*See* Doc. 16-1 p. 41 (stating that separation is possible "as a result of significant reduction or discontinuation of the academic program in which the faculty member does most of his or her teaching"); Doc. 21 p. 10 (plaintiff's response brief) (arguing the provision most likely aims "to provide for situations in which the courses taught by the faculty member no longer exist or are no longer in demand")]. The terms "teaching load" and "courses" appear elsewhere in the handbook [*Id.* at 10 (stating, under section titled Teaching Load, "[t]he standard teaching load is based on a formula that takes into account different course preparations, repeated course preparations, enrollments, and special considerations")]. And as defendant argues, had Maryville College meant to tie separation of tenured professors for institutional circumstances to significant reductions in teaching load, the number of courses taught by the professor, or something else, it could have easily done so [*See* Doc. 22 p. 12 (citing *Maggart*, 259 S.W.3d at 704 ("It is the universal rule that a contract must be viewed from beginning to

17

end and all its terms must pass in review, for one clause may modify, limit or illuminate another.") (citation omitted))].

In sum, the Court does not find the handbook provision to be ambiguous, and based on its interpretation of the language, it is clear the academic program in which plaintiff did most of his teaching—physics—experienced a "significant reduction or discontinuation." Plaintiff was terminated in accordance with the applicable terms of the Faculty Handbook, and his breach of contract claim will be dismissed.

## IV. CONCLUSION

For the reasons discussed herein, the Court will **DENY** plaintiff's motion for partial summary judgment [Doc. 14] and will **GRANT** defendant Maryville College's motion for summary judgment [Doc. 17]. The Court's analysis, which focuses on the contract's plain meaning, is not disturbed by the declarations at issue in defendant's motion to strike [Doc. 25]. Accordingly, and in light of the Court's grant of summary judgment for defendant, defendant's motion to strike [Doc. 25] will be **DENIED as MOOT**. The Court will **DIRECT** the Clerk of Court to **CLOSE** this case.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE